Meyer v. Hatteras Inv. Partners, L.P., 2025 NCBC 62.

STATE OF NORTH CAROLINA

WAKE COUNTY

JOSEPH MEYER; HENRY G.
SCHWARTZ, JR., AS CUSTODIAN
OF THE HENRY G. SCHWARTZ,
JR. IRA; JAMES M. ALLAND, AS
CUSTODIAN OF THE JAMES M.
ALLAND IRA; and CAROL C.
COLLIER, AS CUSTODIAN OF
THE CAROL C. COLLIER IRA,

     Plaintiffs,

v.

HATTERAS INVESTMENT
PARTNERS, L.P.; DAVID PERKINS;
H. ALEXANDER HOLMES; STEVE
E. MOSS; GREGORY S. SELLERS;
and THOMAS MANN,

     Defendants,

and

HATTERAS MASTER FUND, L.P.,

     Nominal Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV027958-910

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO
DISMISS UNDER RULE 12(B)(1) AND
PLAINTIFFS' MOTION FOR
VOLUNTARY DISMISSAL WITHOUT
PREJUDICE**

**[PUBLIC][1]**

1.     **THIS MATTER** is before the Court on the Defendants' Motion to Dismiss Under Rule 12(b)(1) (Defendants' Motion), (ECF No. 39 [Defs.' Mot.]), and the Plaintiffs' Motion for Voluntary Dismissal Without Prejudice (Plaintiffs' Motion), (ECF No. 75 [Pls.' Mot.]) (collectively the Motions).

---

[1] Because certain materials referenced in this Order and Opinion were filed under seal, the Court's ruling was provisionally filed under seal on 3 October 2025. The Court then permitted counsel for the parties to confer and advise the Court whether they contend any matters referenced herein should be sealed. Having afforded the parties this opportunity, the Court now files its Order and Opinion on the public record.

2.     For the reasons set forth herein, the Court **GRANTS** Defendants' Motion, **DISMISSES** this action without prejudice, and **DENIES** Plaintiffs' Motion as **MOOT**.

*Lee Segui PLLC, by Eric Greenlee Steber, Matthew Lee, and Jeremy Williams; Malmfeldt Law Group, P.C., by Paul Malmfeldt; and Silver Law Group, by Scott Silver, for Plaintiffs.*

*Parker Poe Adams & Bernstein LLP, by Melanie Black Dubis and Corri Ann Hopkins, for Defendants David B. Perkins and Hatteras Investment Partners, L.P.*

*Bell, Davis & Pitt, P.A., by Edward B. Davis and Joshua B. Durham, and Pollack Solomon Duffy LLP, by Joshua Solomon, for Defendants Thomas Mann, Gregory S. Sellers, Steve E. Moss, and H. Alexander Holmes.*

*Brooks, Pierce, McLendon, Humphrey & Leonard LLP, by William Gregory Gaught, Jennifer K. Van Zant, Clint S. Morse, and Gabrielle E. Supak, for Nominal Defendant.*

Earp, Judge.

## I.     INTRODUCTION

3.     According to the Complaint, in December 2021, the individual Defendants, all directors of Nominal Defendant Hatteras Master Fund, L.P. (the Master Fund), caused the Master Fund to sell its alternative asset portfolio to The Beneficient Company Group, L.P. (Ben) in exchange for near valueless equity in Ben. Plaintiffs, limited partners in the Master Fund's four feeder funds (Feeder Funds), allege that Defendants breached their fiduciary duties to the Master Fund by proposing and approving this deal, which purportedly caused the Master Fund to lose approximately 98% of its value.

4. Plaintiffs bring this action derivatively on behalf of the Master Fund. Defendants oppose the action, arguing that Plaintiffs lack standing to sue because they are not owners of the Master Fund, and because Plaintiffs have failed to satisfy pre-suit statutory demand requirements.

5. Both sides move to dismiss. Defendants argue that dismissal should be with prejudice pursuant to Rule 12(b)(1) of the North Carolina Rules of Civil Procedure (the Rules). Plaintiffs maintain that the Court should approve a voluntary dismissal without prejudice pursuant to Rule 41.

## II. FACTUAL BACKGROUND

6. The Court does not make findings of fact but recites the factual allegations relevant to its determination of the Motions. *Deleuran v. Thompson*, 2025 NCBC LEXIS 109, at *1 (N.C. Super. Ct. Aug. 22, 2025); *Cone v. Blue Gem, Inc.*, 2023 NCBC LEXIS 127, at *2 (N.C. Super. Ct. Oct. 13, 2023).

7. The Master Fund is a Delaware limited partnership with a primary office in North Carolina. (Compl. ¶ 25, ECF No. 3.) The Master Fund is registered as an investment company under the Investment Company Act of 1940. (Compl. ¶ 25.)

8. The Feeder Funds are (1) Hatteras Core Alternatives TEI Fund, L.P., (2) Hatteras Core Alternatives TEI Institutional Fund, L.P., (3) Hatteras Core Alternatives Fund, L.P., and (4) Core Alternatives Institutional Fund, L.P. (Compl. ¶ 3 n.1.) The Feeder Funds are limited partners of the Master Fund. (Compl. ¶ 30.) While the Feeder Funds invest substantially all their assets in the Master Fund, Plaintiffs allege that only two of the Feeder Funds do so directly. (*See* Compl.

¶ 30 n.4.)  Hatteras Core Alternatives TEI Fund, L.P. and Hatteras Core Alternatives TEI Institutional Fund, L.P. invest in the "Offshore Funds" which, in turn, invest in the Master Fund.  (Compl. ¶ 30 n.4.)

9.     Each Plaintiff is a limited partner in one of the Feeder Funds.  (Compl. ¶¶ 3 n.1, 15–18.)  Plaintiff Joseph Meyer has owned limited partnership units in the Core Alternatives Institutional Fund, L.P. since 2021.   (Compl. ¶¶ 3 & n.1, 15.)  Plaintiff Henry G. Schwartz, Jr. has owned limited partnership units in the Hatteras Core Alternatives TEI Institutional Fund, L.P. since October 2008.[2]  (Compl. ¶¶ 3 & n.1, 16.)  Plaintiffs James Alland and Carol C. Collier have owned limited partnership units in the Hatteras Core Alternatives TEI Fund, L.P. through their IRAs since December 2009 and December 2011, respectively.   (Compl. ¶¶ 3 & n.1, 17–18.)  Collectively, the Feeder Funds in which Plaintiffs are limited partners own approximately 85% of the Master Fund.  (Compl. ¶ 79.)

10.     Defendant Hatteras Investment Partners, L.P. (the Adviser) is a Delaware limited partnership with a primary office in North Carolina.  (Compl. ¶ 19.)  The Adviser is registered as an investment adviser under the Investment Advisers Act of 1940. (Compl. ¶ 19.)  The Adviser is the general partner of each of the Feeder Funds,

_____

[2] Defendants correctly point out that Henry G. Schwartz, Jr. (Schwartz) is a custodian of the Henry G. Schwartz, Jr. IRA.  However, the Complaint alleges that Schwartz himself is a limited partner in one of the Feeder Funds.  (Br. Supp. Defs.' Mot. 9, ECF No. 40 [Defs.' Br. Supp.]; *see* Compl. ¶¶ 16, 77.)  Plaintiffs contend that the Court can reasonably conclude from the Complaint's allegations that Schwartz's IRA is the one who owned partnership units in one of the Feeder Funds.  (Pls.' Br. Opp. Defs.' Mot. 5 n.4, ECF No. 60 [Pls.' Br. Opp'n].)  Because this argument does not affect the outcome of the Motions, the Court declines to address it.

as well as the Master Fund (collectively, the Funds). (Compl. ¶ 19.) The Adviser manages the Funds subject to the control of the Funds' directors. (Compl. ¶¶ 30, 32.)

11. The individual Defendants David B. Perkins (Perkins), H. Alexander Holmes, Steve E. Moss, Gregory S. Sellers, and Thomas Mann are Directors on the board of each of the Funds. (Compl. ¶¶ 3 & n.1, 20–24.)

12. Perkins is the founder, chief executive officer, and majority owner of the Adviser. (Compl. ¶ 20.)

13. Each of the Funds has an agreement of limited partnership that shields both its directors and its general partner from liability absent a judicial finding of willful misfeasance, gross negligence, or the like:

> Directors and the General Partner, including any officer, director, Partner, member, principal, employee or agent of any of them, will not be liable to the Partnership or to any of its Partners for any loss or damage occasioned by any act or omission in the performance of the Person's services under this Agreement, in the absence of a final judicial decision on the merits from which no further right to appeal may be taken that the loss is due to an act or omission of the Person constituting willful misfeasance, bad faith, gross negligence or reckless disregard of the Person's duties under this Agreement.

(Compl. ¶ 34 n.6.)

## A. Ben, Perkins, and the Adviser

14. In 2021, Ben was a startup company that purportedly offered "liquidity products" to those holding alternative assets. (Compl. ¶ 38.) On 5 November 2021, GWG Holdings, Inc. (GWG), Ben's parent company from December 2019 through November 2021, filed a 10-K revealing that (a) Ben was being investigated by the Securities and Exchange Commission (SEC); (b) Ben's alternative asset portfolio had

substantially declined in value; and (c) Ben was "hemorrhaging cash." (Compl. ¶¶ 13, 38–39, 41.)

15.    In the months prior to December 2021, Perkins had a series of meetings with Brad Heppner, Ben's founder and manager. (Compl. ¶¶ 39, 49.) During these meetings, Ben offered the Adviser certain business opportunities contingent upon the completion of a later transaction in which the Master Fund would transfer its alternative asset portfolio to Ben in exchange for Ben securities (the Ben Transaction). (*See* Compl. ¶¶ 6, 49.) Among those opportunities were (a) an investment advisory contract in which the Adviser would receive compensation for managing the assets involved in the Ben Transaction; and (b) a joint venture in which the Adviser and Ben would create new investment funds, and the Adviser would receive additional fees for managing the new funds' assets. (Compl. ¶¶ 50–51.)

16.    During the discussions between Perkins and Heppner, Ben provided to Perkins an offering document describing the risks associated with the Ben securities. (Compl. ¶¶ 52–53.) Such risks included that Ben had no "significant operating history or established customer base"; the Ben securities would "be considered illiquid until their stated maturity"; there was "no public market for the [Ben securities]"; and the holder of the Ben securities would have to hold them "indefinitely" if Ben "never engage[d] in a public listing[.]" (Compl. ¶ 53.) Perkins also learned that if Ben undertook a public listing, the holder of the Ben securities could not sell such securities until the expiration of a three-month lockup period. (Compl. ¶¶ 12, 54.)

**B.    The Ben Transaction**

17.    On 7 December 2021, the Directors held a telephone meeting.  (Compl. ¶¶ 6, 10.)  During the meeting, Perkins represented that an unnamed purchaser had offered to transfer its securities to the Master Fund in exchange for all the Master Fund's alternative assets.  (Compl. ¶ 6.)  The plan was for the Master Fund to deliver the purchaser's securities to the Feeder Funds' limited partners (Plaintiffs), who would then be able to liquidate them if desired.  (Compl. ¶ 6.)  Perkins represented that the Adviser had conducted "thorough due diligence" of the unnamed purchaser even though the Adviser had not retained a financial professional to evaluate the Ben securities.  (Compl. ¶ 60.)

18.    Perkins knew but did not disclose that the purchaser was Ben.  (Compl. ¶ 7.)  The remaining Directors, without knowing the identity of the purchaser, approved the transaction.  (Compl. ¶ 10.)  It closed later that day.  (Compl. ¶ 10.)  Subsequently, the Ben securities dramatically dropped in value and, as a result, the Master Fund lost approximately 98% of its value.  (Compl. ¶¶ 1, 71, 73.)

### III.    PROCEDURAL BACKGROUND

19.    Plaintiffs filed their Complaint on 4 September 2024.

20.    Defendants filed their Rule 12(b)(1) motion and a supporting brief on 12 November 2024.  (Defs.' Mot.; Br. Supp. Defs.' Mot., ECF No. 40 [Defs.' Br. Supp.].)  Plaintiffs filed their response on 20 December 2024, (Pls.' Br. Opp. Defs.' Mot., ECF No. 60 [Pls.' Br. Opp'n]), and Defendants filed a reply on 9 January 2025, (Reply Br. Supp. Defs.' Mot., ECF No. 70 [Defs.' Reply]).

21. On 26 June 2025, Plaintiffs filed their motion requesting that the Court approve a voluntary dismissal. (Pls.' Mot.; Pls.' Br. Supp. Pls.' Mot., ECF No. 76 [Pls.' Br. Supp.].) Defendants filed their response on 9 July 2025, (Defs.' Br. Resp. Pls.' Mot., ECF No. 78 [Defs.' Resp. Br.]), and Plaintiffs filed their reply on 17 July 2025, (Pls.' Reply Br. Supp. Pls.' Mot., ECF No. 79 [Pls.' Reply].)

22. Both Motions have been fully briefed, and the Court held a hearing on the Motions on 4 September 2025. (*See* ECF No. 82.) They are now ripe for resolution.

## IV.    LEGAL STANDARD

23. Whereas in most circumstances a plaintiff may voluntarily dismiss an action before resting his case on notice to the other parties, Plaintiffs in this case appropriately seek the Court's approval to do so. This is because under North Carolina law, a derivative action on behalf of a limited partnership "shall not be discontinued, dismissed, compromised or settled without approval of the court." N.C.G.S. § 59-1005.[3]

24. To determine whether to approve a voluntary dismissal in a derivative action, the Court applies a balancing test, weighing "(1) any legitimate corporate [or LLC] claims as brought forward in the derivative . . . suit against (2) the corporation's [or LLC's] best interests." *Weatherspoon Fam. LLC v. Hatteras Inv. Partners, L.P.,*

---

[3] Likewise, when the plaintiff moves to voluntarily dismiss an action under Rule 41(a)(2), "[the] action or any claim therein shall not be dismissed at the plaintiff's instance save upon order of the judge and upon such terms and conditions as justice requires." N.C.G.S. § 1A-1, Rule 41(a)(2). However, the effect of a dismissal pursuant to Rule 12(b)(1) versus a dismissal pursuant to Rule 41(a)(2) can be significant. The latter rule contains a savings provision that permits a new action based on the same claim to be commenced within one year after dismissal unless the judge specifies a shorter time.

2025 NCBC LEXIS 97, at *12 (N.C. Super. Ct. July 31, 2025) (quoting *Alford v. Shaw*, 327 N.C. 526, 540 (1990)).[4]

25.     Whether an action should be dismissed under Rule 41(a)(2), and whether that dismissal is with or without prejudice, are matters within the Court's discretion. *In re Se. Eye Ctr.-Pending Matters*, 2020 NCBC LEXIS 133, at *2–3 (N.C. Super. Ct. Nov. 12, 2020) (citing *West v. G.D. Reddick, Inc.*, 38 N.C. App. 370, 372 (1978)); *Sloan v. Inolife Techs., Inc.*, 2017 NCBC LEXIS 45, at *18 (N.C. Super. Ct. May 22, 2017).

26.     However, a court shall dismiss the action when it appears that the court lacks subject matter jurisdiction.  N.C.G.S. § 1A-1, Rule 12(h)(3).  A defect in subject matter jurisdiction may be raised by a party or by the court *sua sponte*.  *Conner Bros. Mach. Co. v. Rogers*, 177 N.C. App. 560, 561 (2006).  "Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction."  *In re Z.G.J.*, 378 N.C. 500, 504 (2021) (internal quotation marks omitted).

## V.     ANALYSIS

27.     Plaintiffs contend that the Court should dismiss this action without prejudice pursuant to Rule 41(a)(2) for two primary reasons: (1) under Delaware law, whether a limited partner in a feeder fund has standing to bring a derivative claim on behalf of a master fund is a question of first impression that they believe should be decided in Delaware (and another action arising out of the Ben Transaction has

---

[4] The logic of the *Alford* balancing test applies equally to derivative actions involving limited partnerships.  The test is derived from two sources: *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981), and N.C.G.S. § 55-55(c), the predecessor to N.C.G.S. § 55-7-45.  *See Alford*, 327 N.C. at 540; *Alford v. Shaw*, 320 N.C. 465, 469–71 (1987).  Notably, N.C.G.S. § 55-7-45 is substantially similar to N.C.G.S. § 59-1005, both of which require court approval for the dismissal of a derivative proceeding.  *Compare* N.C.G.S. § 55-7-45, *with id.* § 59-1005.

been filed in Delaware by an investor in one of the Feeder Funds, such that the Delaware Court of Chancery will soon address this issue); and (2) Defendants have supposedly engaged in "dilatory tactics" that have wasted judicial resources and delayed the progression of this action. (Pls.' Br. Supp. 4–7.)

28. Even while arguing for dismissal, Plaintiffs assert that they may need to re-file this action in North Carolina at a later date, (Pls.' Reply 4), although this assertion conflicts with the affidavit Plaintiffs' counsel submitted.[5] (Decl. Paul Malmfeldt, ECF No. 76.2.)

29. Defendants do not oppose Plaintiffs' Motion to the extent it seeks dismissal. (Defs.' Resp. Br. 1.) However, Defendants contend that the Court should dismiss this action with prejudice or, alternatively, eliminate the one-year savings provision in Rule 41(a)(2) such that Plaintiffs cannot re-file this action. (Defs.' Resp. Br. 1.)

30. In support of their argument, Defendants point to their motion to dismiss for lack of standing and argue that Plaintiffs' derivative claim is not legitimate and therefore fails the *Alford* balancing test. Defendants also contend that they have not engaged in, nor do they plan to engage in, dilatory tactics; Plaintiffs' representation that they do not plan to re-file this action warrants barring their ability to do so; and Plaintiffs have wasted judicial resources by filing a motion for voluntary dismissal in

---

[5] "While Plaintiffs reserve all of their rights, they have no intention of initiating a new derivative action against Defendants relating to the Master Fund's transaction with The Beneficient Company Group, L.P. . . . in the Court of Chancery, in arbitration, or in any other forum." (Decl. Paul Malmfeldt ¶ 24.)

this action and in a related action[6] after substantial motion practice.  (Defs.' Resp. Br. 11–12, 14–15.)

31.     If Plaintiffs lack standing to bring this action, then Defendants' Motion to dismiss for lack of subject matter jurisdiction has merit, the claim is not legitimate, and Plaintiffs' Motion to dismiss pursuant to Rule 41(a)(2) cannot succeed.  Therefore, because resolution of Plaintiffs' Motion depends on the Court's determination of Defendants' Motion, the Court directs its attention to Defendants' arguments regarding Plaintiffs' standing to bring this action.

32.     The Master Fund is a Delaware limited partnership.  (Compl. ¶ 25.)  As such, the Court uses Delaware law to determine whether Plaintiffs' claim is legitimate.  *See* N.C.G.S. § 59-901 ("[T]he laws of the jurisdiction under which a foreign limited partnership is organized govern its organization and internal affairs and the liability of its partners[.]"); *see also Edgar v. MITE Corp.* 457 U.S. 624, 645 (1982) ("The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs[—]matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders[—]because otherwise a corporation

---

[6] On 4 December 2024, the complaint in *Weatherspoon Family LLC v. Hatteras Investment Partners, L.P.* was filed.  That action also arises out of the Ben Transaction, and counsel for the plaintiff there are also counsel for Plaintiffs here.  *See* Complaint, *Weatherspoon Fam. LLC v. Hatteras Inv. Partners, L.P.*, 2025 NCBC LEXIS 97 (N.C. Super. Ct. July 31, 2025) (No. 24CV038870-910), (ECF No. 3).  The plaintiff in *Weatherspoon* filed a motion for voluntary dismissal on 9 May 2025.  Motion for Voluntary Dismissal Without Prejudice, *Weatherspoon*, 2025 NCBC LEXIS 97, (ECF No. 51).  The Court denied the motion without prejudice on 31 July 2025.  *Weatherspoon*, 2025 NCBC LEXIS 97, at *30–31.

could be faced with conflicting demands."); *Ray v. Deloitte & Touche, L.L.P.*, 2006 NCBC LEXIS 7, at *12–13 (N.C. Super. Ct. Apr. 21, 2006) ("The laws of the state where the limited partnership was organized control for the purpose of determining whether the requirements for bringing a derivative action have been satisfied.").

A.    **Ownership Requirement**

33.    To bring a derivative suit on behalf of a Delaware limited partnership, "the plaintiff must be a partner or an assignee of a partnership interest at the time of bringing the action and . . . [a]t the time of the transaction of which the plaintiff complains[.]"  6 Del. C. § 17-1002.

34.    Defendants contend that Plaintiffs do not meet this ownership requirement because Plaintiffs fail to allege that they were partners of the Master Fund at the time of the Ben Transaction.  (Defs.' Br. Supp. 9.)  Instead, Plaintiffs allege only that they were limited partners of the Feeder Funds.  (Defs.' Br. Supp. 9; *see* Compl. ¶¶ 15–18.)

35.    Relying on *Bamford v. Penfold, L.P.*, C.A. No. 2019-0005-JTL, 2020 Del. Ch. LEXIS 79 (Del. Ch. Feb. 28, 2020), Plaintiffs respond that Delaware law already recognizes double derivative standing in the "alternative entity space," and they believe that it should apply to limited partnerships.  (Pls.' Br. Opp'n 18.)  Further, Plaintiffs argue that Delaware law should be expanded to permit limited partners in a parent entity (here, the Feeder Funds) to sue on behalf of its subsidiary (here, the Master Fund).  (Pls.' Br. Opp'n 20–21.)

36. In *Bamford*, the Court of Chancery recognized the standing of limited partners to sue on behalf of an LLC when the limited partnership's ownership interest was directly in the LLC. *Bamford*, 2020 Del. Ch. LEXIS 79, at \*73. However, the parties agree that Delaware has not addressed whether double derivative standing exists when the limited partners' ownership interest is in Feeder Funds that are one step removed from a Master Fund, as is true here. (Pls.' Br. Opp'n 18–19; Defs.' Reply 3–4; Pls.' Br. Supp. 16–17.) They also agree that Delaware has not addressed whether, in that indirect ownership scenario, the parent entity must own 100% of the subsidiary for double derivative standing to exist. (Defs.' Reply 3–4; Pls.' Br. Supp. 16–17); *see Bamford*, 2020 Del. Ch. LEXIS 79, at \*72 n.21 (declining to decide whether the parent must own 100% of the subsidiary LLC); *see also Lambrecht v. O'Neal*, 3 A.3d 277, 283 n.14 (Del. 2010) ("Courts in a handful of jurisdictions appear to recognize, at least implicitly, a right of parent company shareholders at the time of the alleged wrongdoing to sue double derivatively. . . . To date, the Delaware courts have not addressed this specific question nor do we purport to do so, expressly or implicitly, in this [o]pinion.").

37. Defendants argue that Delaware has only permitted double derivative standing in the corporate context. (Defs.' Reply 2.) Even assuming *arguendo* that double derivative standing could apply in the limited partnership context, Defendants contend that the Master Fund does not qualify as a subsidiary because it is neither wholly owned nor majority controlled by the Feeder Funds owned by Plaintiffs. (Defs.' Reply 3–6.) Specifically, Defendants argue that (a) Delaware law

does not support Plaintiffs' concept of aggregating the interests of multiple entities to create a corporate parent for double derivative standing; and, in any event, (b) Plaintiffs fail to allege that the Feeder Funds owned by Plaintiffs have voting control over the Master Fund. (Defs.' Reply 5–7.)

38. In addition, Defendants maintain that Delaware law requires that both the parent and the subsidiary be named as nominal defendants in a double derivative suit, but Plaintiffs have not named the Feeder Funds as nominal defendants. (Defs.' Reply 3.)

39. As the parties' positions underscore, whether Plaintiffs meet the ownership requirement involves unsettled issues of Delaware law. *See Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1079 n.10 (Del. 2011) ("[S]ome courts in other jurisdictions have recognized a double derivative right in the case of a less-than-wholly-owned subsidiary, but Delaware courts have not yet ruled on that issue."). However, it is not necessary in this instance to determine those issues to decide the Motions because, as discussed below, Plaintiffs have failed to satisfy the derivative demand prerequisite to suit.

## B. Demand Requirement

40. Before bringing a derivative action under Delaware law, a limited partner must make a demand on the limited partnership's general partner unless such an effort "is not likely to succeed." *See* 6 Del. C. §§ 17-1001, 17-1003; *JER Hudson GP XXI LLC v. DLE Invs., LP*, 275 A.3d 755, 783 (Del. Ch. 2022) (stating that the limited partner must "make a demand on the general partner[] of [the] limited

partnership . . . unless such a demand would be futile"). If the plaintiff relies on demand futility, the complaint must "set forth with particularity the effort, if any, of the plaintiff to secure initiation of the action by [the] general partner or the reasons for not making the effort." 6 Del. C. § 17-1003.

41. A complaint properly alleges demand futility if it sets forth particularized facts that enable the Court to affirmatively answer any of the three following questions:

> (i) whether the [general partner] received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

> (ii) whether the [general partner] faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and

> (iii) whether the [general partner] lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

*See United Food & Commer. Workers Union v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021) (articulating demand futility standard for shareholder derivative suits); *Wenske v. Blue Bell Creameries, Inc.*, C.A. No. 2017-0699-JRS, 2018 Del. Ch. LEXIS 221, at *40–41 (Del. Ch. July 6, 2018) (observing that "[c]orporate standards apply to limited partnerships in the 'demand excused' analysis" and that "[d]emand futility issues in the partnership context are the same as in the corporate context").

42. Alleging with particularity the necessary facts to establish demand futility is a stringent pleading standard. *Reith v. Lichtenstein*, C.A. No. 2018-0277-MTZ, 2019 Del. Ch. LEXIS 244, at *19 (Del. Ch. June 28, 2019); *Brehm v. Eisner*, 746 A.2d

244, 254 (Del. 2000). Still, when evaluating whether demand futility is adequately pled, the Court must "draw all reasonable inferences in the plaintiff's favor." *Marchand v. Barnhill*, 212 A.3d 805, 818 (Del. 2019).

43. Here, Plaintiffs admit that they did not make a demand. (*See* Compl. ¶ 85.) Accordingly, the Court must determine whether Plaintiffs pled with particularity the facts necessary to conclude that a derivative demand in this case would have been futile. *See JER Hudson*, 275 A.3d at 783.

### 1. Subject of Demand Futility Allegations

44. Defendants first argue that Plaintiffs' pleading is inadequate because they plead futility with respect to the Master Fund's Directors, not its general partner, the Adviser. (Defs.' Br. Supp. 10–12.)

45. Plaintiffs concede that demand futility must be pled as to the general partner in the limited partnership context. (Pls.' Br. Opp'n 24, 26 n.10.) Nevertheless, they contend that demand futility with respect to the Adviser should be inferred from factual allegations concerning its majority owner and CEO, Perkins. (Pls.' Br. Opp'n 23, 27–29.)

46. Defendants respond that allegations about Perkins do not establish demand futility as to the Adviser. (Defs.' Reply 9.) Citing *Inter-Marketing Group USA, Inc. v. Armstrong*, C.A. No. 2017-0030-TMR, 2020 Del. Ch. LEXIS 391, at *20–21 (Del. Ch. Jan. 31, 2020),[7] they contend that the demand futility analysis "focuses

---

[7] The Court notes that the Rules of the Court of Chancery allow unreported Delaware cases to be cited as precedent. *See* Del. Ch. Ct. R. 7(e); *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C.

on the general partner itself (as an entity)," rather than those who own it. (Defs.' Reply 9.)[8]

47.   By statute, a derivative demand must be made on the general partner of a limited partnership. *See* 6 Del. C. § 17-1001. Because Plaintiffs' position is that a demand is excused because it would have been futile, the Court reviews the factual allegations in their entirety to determine whether demand futility as to the Adviser has been pled with particularity. *See Marchand*, 212 A.3d at 818 (stating that the "inquiry at the demand futility stage . . . requir[es] that the plaintiff plead facts with particularity"); *In re Camping World Holdings, Inc. S'holder Derivative Litig.*, C.A. No. 2019-0179-LWW, 2022 Del. Ch. LEXIS 24, at *17 (Del. Ch. Jan. 31, 2022) ("[W]hat the pleader must set forth are particularized factual statements that are essential to the claim." (quoting *Brehm*, 746 A.2d at 254)).

48.   Conclusory allegations about Perkins, the Adviser's majority owner and CEO, are not a basis for determining whether a demand on the Adviser itself would have been futile. It is true that the conduct of an individual who controls a general partner is typically relevant to the demand futility analysis. *See Gerber v. EPE Holdings, LLC*, C.A. No. 3543-VCN, 2013 Del. Ch. LEXIS 8, at *52–55 (Del. Ch. Jan.

---

605, 614 n.6 (2018). Thus, the Court considers both reported and unreported Delaware cases to have equal authority. *See Corwin*, 371 N.C. at 614 n.6.

[8] The parties also disagree about whether Plaintiffs, having asserted a double derivative suit, must plead demand futility at both the Master Fund and Feeder Fund levels. (Pls.' Br. Opp'n 22; Defs.' Reply 10–11.) Given that whether Delaware recognizes double derivative standing in the master fund and feeder fund context is an issue of first impression, the Court declines to determine at which levels demand futility must be pled. Again, however, demand futility must be pled with particularity at least as to the Adviser.

18, 2013) (demand excused where defendant allegedly caused partnership to overpay defendant's affiliates and defendant "dominat[ed] and control[led]" the partnership's general partner); *Lipman v. GPB Cap. Holdings LLC*, C.A. No. 2020-0054-SG, 2020 Del. Ch. LEXIS 340, at *23 (Del. Ch. Nov. 18, 2020) ("A general partner has a disabling interest for pre-suit demand purposes when it faces a 'substantial likelihood' of liability in connection with the derivative claim(s) asserted against it. The same can be said for general partners controlled by individuals or entities that face a substantial likelihood of liability in connection with such claims." (citation modified)); *Inter-Marketing Grp.*, 2020 Del. Ch. LEXIS 391, at *35–36 (demand excused where individual general partner, through board of directors, consistently failed to establish monitoring system).

49. Here, however, Plaintiffs fail to allege with particularity sufficient facts to show that Perkins controlled the Adviser. Plaintiffs allege that Perkins was the "founder, CEO and majority owner" of the Adviser but otherwise make no allegations concerning the Adviser's governance. (*See* Compl. ¶ 3.) Nowhere does the Complaint allege that Perkins was the Adviser's general partner, controlled its voting rights, or otherwise had the ability to make decisions for the Adviser on his own. *See* 6 Del. C. § 17-405 (stating that "[a] partnership agreement may provide for classes or groups of general partners having such relative rights, powers and duties as the partnership agreement may provide"); *see also id.* § 17-1001; *cf. Bamford*, 2020 Del. Ch. LEXIS 79, at *48–50 (complaint supported a reasonable inference that general partners

controlled limited partnership because they exclusively owned the "general partnership interests").

50.     Similarly, Plaintiffs do not allege that Perkins acted on behalf of the Adviser at the meeting, nor do they describe the Adviser's approval of the Ben Transaction.  Instead, the Complaint merely states that "the other Directors all approved the Ben Transaction on behalf of the Master Fund . . . and the transaction closed later that day." (*See* Compl. ¶¶ 2, 10, 61.)[9] While Plaintiffs argue that Perkins' status as the founder, majority owner, and CEO of the Adviser is sufficient to establish his control over the Adviser, the Court declines to make this inferential leap.  (*See* Compl. ¶ 3; Pls.' Br. Opp'n 6 & n.7.)  That the Complaint acknowledges there are other owners of the Adviser but otherwise omits reference to them is a notable deficiency.  (*See* Compl. ¶ 3.)

51.     Because the allegations regarding Perkins are insufficient, by themselves, to allege demand futility as to the Adviser, the Court turns to whether the Complaint alleges particularized facts showing that the Adviser itself either (a) received a material personal benefit from the Ben Transaction or (b) faces a substantial likelihood of liability as a result.[10]  *See Zuckerberg*, 262 A.3d at 1059.

---

[9] The conclusory language Plaintiffs use in their brief to attribute Perkins' alleged misconduct to the Adviser is telling.  (*See, e.g.*, Pls.' Br. Opp'n 29 ("Perkins and*, by extension*, the Adviser, knew that the securities Ben proposed to issue the Master Fund were illiquid and risky[.]") (emphasis added).)

[10] Plaintiffs do not argue that the Adviser lacked independence from someone who received a material personal benefit from the Ben Transaction.  (*See* Pls.' Br. Opp'n 25, 27.)  Therefore, the Court does not address that part of the *Zuckerberg* test.

### 2. Material Personal Benefit

52. If demand futility is based on the Adviser's receipt of a benefit, the Complaint must allege with particularity those facts necessary to show that the benefit was material to the Adviser. *See id.* at 1061–62 (plaintiff failed to allege materiality where complaint did not state that certain benefits were material to the recipient or that the recipient "received anything other than arm's lengths terms"); *Hanna v. Paradise*, C.A. No. 2024-0228-KSJM, 2025 Del. Ch. LEXIS 165, at *14 (Del. Ch. July 3, 2025) ("Whether a benefit is material is a question of fact that takes into consideration the amount, the recipient's wealth, and the circumstances surrounding the benefit.").

53. Plaintiffs argue that they adequately pled that the Adviser received a material personal benefit from the Ben Transaction. (Pls.' Br. Opp'n 25–27.) They point to their allegation that Ben offered the Adviser "lucrative business opportunities" contingent on the Ben Transaction, including an investment advisory contract and a joint venture opportunity, as the Adviser's receipt of a material benefit. (Pls.' Br. Opp'n 26; Compl. ¶¶ 49–50.)

54. Defendants respond that, to the extent Plaintiffs plead the receipt of a material benefit, they fail to do so with particularity. (*See* Defs.' Br. Supp. 12–14.) They contend that Plaintiffs only generally describe the terms of any purported agreements between Ben and the Adviser, and that Plaintiffs fail to allege with particularity facts to show that the benefits were material to the Adviser. (*See* Defs.' Br. Supp. 14.)

55.     The Court agrees with Defendants.  The Complaint alleges that Ben offered the Adviser two business opportunities contingent on the Ben Transaction: an investment advisory contract and a joint venture where Ben and the Adviser would form new investment funds.  (Compl. ¶¶ 49–51.)  As for the advisory contract, the Complaint alleges that it included the following terms: "The Adviser would receive a base fee in the amount of ▮▮ on an annual basis of the value of investments held by [a] special purpose vehicle, as well as a performance allocation of ▮▮ in excess of a hurdle amount."  (Compl. ¶ 50.)  The special purpose vehicle would hold the assets the Master Fund contributed to Ben, which were valued at $305 million.  (Compl. ¶¶ 2, 50.)  As for the joint venture opportunity, the Complaint alleges that Ben would contribute "up to ▮▮ of the net asset value of the assets held by the Ben/[Adviser] special purpose vehicle."  (Compl. ¶ 51.)

56.     Plaintiffs' description of these two business opportunities does not identify why either would be material to the Adviser.  That the business opportunities Ben proposed to the Adviser would presumably involve large sums of money is insufficient to show materiality without facts to put those amounts in context.  *See Orman v. Cullman,* 794 A.2d 5, 30 (Del. Ch. 2002) ("[T]here is no bright-line dollar amount at which . . . fees received by a director become material[.]"); *In re Goldman Sachs Grp., Inc. S'holder Litig.,* Civil Action No. 5215-VCG, 2011 Del. Ch. LEXIS 151, at *36–37 (Del. Ch. Oct. 12, 2011) (alleged investment of at least $670 million into funds managed by defendant-director insufficient to show materiality where plaintiff did not allege defendant "relie[d] on the management of these funds for his livelihood").

57. Accordingly, Plaintiffs have not adequately pled that the Adviser received a material benefit from the Ben Transaction such that a derivative demand made on it would have been futile. The Court now turns to whether Plaintiffs have adequately alleged demand futility because the Adviser faces a substantial likelihood of liability on their claim. *See Zuckerberg*, 262 A.3d at 1059.

### 3. Substantial Likelihood of Liability

58. "To establish a substantial likelihood of liability, a plaintiff need not 'demonstrate a reasonable probability of success on the claim.'" *Ellis v. Gonzalez*, C.A. No. 2017-0342-SG, 2018 Del. Ch. LEXIS 227, at *16 (Del. Ch. July 10, 2018) (quoting *In re China Agritech, Inc.*, C.A. No. 7163-VCL, 2013 Del. Ch. LEXIS 132, at *44 (Del. Ch. May 21, 2013)). Instead, "the plaintiff must 'make a threshold showing, through the allegation of particularized facts, that [its] claims have some merit.'" *Id.* (quoting *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993)). "This standard recognizes that the purpose of the particularity requirement is not to prevent derivative actions from going forward," but to ensure that only those supported by a reasonable factual basis proceed. *In re China Agritech*, 2013 Del. Ch. LEXIS 132, at *44; *Rales*, 634 A.2d at 934.

59. Plaintiffs argue that they have adequately pled that the Adviser faces a substantial likelihood of liability for breach of fiduciary duty. They point to their allegations that (a) "Perkins and, by extension, the Adviser" failed to disclose the Ben securities' risks and misrepresented that they could be sold for cash; (b) Ben had offered the Adviser business opportunities contingent on the Ben Transaction; and

(c) Perkins represented that the Adviser had conducted "thorough due diligence" of the Ben securities, but the Adviser did not hire a financial professional to evaluate these securities, which subsequently dropped in value. (Pls.' Br. Opp'n 25–30; Compl. ¶¶ 55–60, 71.) Plaintiffs also argue that the Complaint establishes demand futility because the allegations of wrongdoing are sufficient to overcome the business judgment rule[11] and, if proven, would subject the Adviser (and the Directors) to "non-indemnifiable liability." (Pls.' Br. Opp'n 27–28; Compl. ¶¶ 14, 82–85.)

60.     Defendants respond that an allegation that a demand would be akin to asking a defendant to sue itself is not sufficient to satisfy the pleading requirements for demand futility. (Defs.' Br. Supp. 14–15 (citing *Cabaniss v. Deutsche Bank Sec., Inc.*, 170 N.C. App. 180, 183–84 (2005) (allegation that demand was futile because it "would in essence be asking the managers of the general partner to sue themselves" failed to establish demand futility)); Defs.' Reply 9–10.)

61.     In this case, the Adviser is indemnified unless it is found liable for willful misfeasance, gross negligence, bad faith, or reckless disregard of its duties. (*See* Compl. ¶ 34 n.6.) Therefore, to allege demand futility, the Complaint must allege with particularity that the Adviser's conduct reaches those levels. Plaintiffs' burden

---

[11] "The business judgment rule generally protects the actions of directors, affording them the presumption directors act on an informed basis and in the honest belief they acted in the best interest of the corporation." *Krim v. ProNet, Inc.*, 744 A.2d 523, 527 (Del. Ch. 1999). "To overcome the presumption of the business judgment rule, the burden is on the plaintiff to show the defendant directors failed to act (1) in good faith, (2) in the honest belief that the action taken was in the best interest of the company or (3) on an informed basis." *Id.* The business judgment rule also applies to general partners in a limited partnership. *In re Boston Celtics Ltd. P'ship S'holders Litig.*, C.A. No. 16511, 1999 Del. Ch. LEXIS 166, at *10–12 (Del. Ch. Aug. 6, 1999).

in this regard is a heavy one. *See City of Warren Gen. Emps.' Ret. Sys. v. Roche*, C.A. No. 2019-0740-PAF, 2020 Del. Ch. LEXIS 352, at *55 (Del. Ch. Nov. 30, 2020) ("To plead gross negligence, a plaintiff must allege conduct that constitutes reckless indifference or actions that are without the bounds of reason. Because fiduciaries must take risks . . . they are exposed to liability for breach of fiduciary duty only if their breach of the duty of care is extreme." (citation modified)); *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009) ("[B]ad faith conduct may be found where a director intentionally acts with a purpose other than that of advancing the best interests of the corporation, acts with the intent to violate applicable positive law, or intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." (citation modified)); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 157 (Del. Ch. 2004) (same); *Newman v. KKR Phorm Invs., L.P.*, C.A. No. 2022-0310-NAC, 2023 Del. Ch. LEXIS 699, at *13–14 (Del. Ch. Sep. 5, 2023) ("This Court has held on numerous occasions that to state a bad-faith claim, a plaintiff must show . . . that the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." (quoting *In re Mead Westvaco S'holders Litig.*, 168 A.3d 675, 684 (Del. Ch. 2017)); *Cygnus Opportunity Fund, LLC v. Wash. Prime Grp., LLC*, 302 A.3d 430, 463 (Del. Ch. 2023) (" '[W]illful misconduct' . . . involves either malicious conduct or 'conduct designed to defraud or seek an unconscionable advantage.' " (quoting *Dieckman v. Regency GP, LP*, C.A. No. 11130-CB, 2021 Del. Ch. LEXIS 28, at *89 (Del. Ch. Feb. 15, 2021))).

62. Once again, Plaintiffs urge the Court to infer that their allegations regarding Perkins are sufficient to show that the Adviser engaged in conduct that would subject it to liability for which it would not be indemnified. For the reasons stated above, the Court declines Plaintiffs' invitation.

63. Having found that the Complaint alleges neither a material benefit nor a substantial likelihood of liability as to the Adviser, the Court determines that Plaintiffs have not adequately alleged demand futility. Consequently, Plaintiffs have failed to meet a threshold requirement necessary for this Court to have subject matter jurisdiction.

64. Accordingly, Defendants' Motion to dismiss this action for lack of subject matter jurisdiction shall be **GRANTED,** and this action shall be **DISMISSED** without prejudice.[12] *Kane v. Moore*, 2018 NCBC LEXIS 157, at \*13, \*28, \*35–36 (N.C. Super. Ct. Nov. 26, 2018) (dismissing without prejudice where plaintiffs lacked standing). Plaintiffs' Motion for voluntary dismissal without prejudice is **DENIED** as moot.

## VI. CONCLUSION

65. **WHEREFORE**, for the foregoing reasons, the Court hereby **GRANTS** Defendants' Motion and **DENIES** Plaintiffs' Motion as moot. This matter is **DISMISSED** without prejudice.

---

[12] Plaintiffs also argue that the Defendants' Motion should have been brought under Rule 12(b)(6) because Defendants challenge the sufficiency of the Complaint. (*See* Pls.' Br. Opp'n 15–16.) This argument is inapposite because "[s]tanding arguments can be presented under both Rule 12(b)(1) and Rule 12(b)(6)[.]" *Deleuran*, 2025 NCBC LEXIS 109, at \*5 (quoting *Finley v. Brown*, 2017 NCBC LEXIS 79, at \*8 (N.C. Super. Ct. Sep. 1, 2017)).

**SO ORDERED**, this the 10th day of October, 2025.

/s/ Julianna Theall Earp
Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases